**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLOBAL ENERGY CONSULTANTS, LLC, | |
| Plaintiff/Counterclaim Defendant, | Civil Action No. 2:08-cv-05827-ER |
| v. | |
| HOLTEC INTERNATIONAL and HOLTEC MANUFACTURING DIVISION, INC., | |
| Defendants/Counterclaimant. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT THAT THE WRITTEN**
**CONTRACTS ARE UNENFORCEABLE AND NOT BREACHED**

Noah H. Charlson, Esq.
BAZELON LESS & FELDMAN, P.C.
1515 Market Street, Suite 700
Philadelphia, PA19102-1907
Telephone:  (215) 568-1155
Facsimile:  (215) 568-9319

Glen M. Diehl, Esq. (Admitted *Pro Hac Vice*)
DIEHL SERVILLA LLC
33 Wood Avenue South
Second Floor, Suite 210
Iselin, NJ 08830
Telephone: (732) 815-0404
Facsimile: (732) 815-1330

Attorneys for Defendants and Counterclaimant
Holtec International and Holtec Manufacturing
Division, Inc.

May 17, 2011

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………….. 1

STATEMENT OF FACTS………………………………………………… 3

    A.    Holtec Had Substantial Experience Before October 2001……… 3

    B.    GEC Pursues "International" SNF Storage With The Stanton Group In 2001……………………………………………………… 3

    C.    GEC Signed The Agreement With Holtec In October 2001…….. 5

    D.    GEC Signed The Same Agreement With Holtec Manufacturing.. 9

    E.    GEC Meets With The Holtec Companies On November 13, 2001……………………………………………………………… 10

    F.    GEC Signs Agreement And Meets With Transnuclear In November 2001………………………………… 11

    G.    GEC and The Stanton Group Abandon The Business Plan of "International" SNF Storage In 2002………….. 12

    H    GEC's Parallel Pursuit of the Holtec Companies and Transnuclear Continues in 2002…………………………. 13

    I.    GEC Pursues Holtec Manufacturing's Competitors………….. 15

    J.    GEC'S Changing Contentions As To The Meaning Of Circumvention…………………………………………… 16

ARGUMENT…………………………………………………………….. 18

I.    SUMMARY JUDGMENT STANDARD……………………….. 18

II.    THE AGREEMENTS ARE UNENFORCEABLE………………………    19

        A.    The Non-Circumvention Provisions Are
              Indefinite And Therefore Uneforceable………………………….    19

        B.    The Agreements Are An Unreasonable Restraint On Trade……..    22

III.   THE GEC-HOLTEC AGREEMENT IS
       LIMITED TO "INTERNATIONAL" SNF
       STORAGE WHICH HOLTEC NEVER PURSUED……………………..    24

        A.    The Scope Of The Agreement Is Ambiguous……………………    24

        B.    Extrinsic Evidence Explains The Ambiguity……………..……….    26

        C.    The Ambiguity Should Be Construed Against GEC……..……….    28

        D.    Holtec Considered GEC's Concept Absurd And
              Never Pursued It…………………………………………..………….    28

IV.    GEC BREACHED THE AGREEMENT TERMINATING
       HOLTEC'S OBLIGATIONS UNDER THE AGREEMENT….…………    29

        A.    GEC Breached The Agreement In November 2001……..………..    29

        B.    GEC's Breach Continued in 2002…..……………………..……….    31

V.     HOLTEC MANUFACTURING DID NOT CIRCUMVENT GEC…....…    32

VI.    THE HOLTEC COMPANIES DID NOT MISUSE OR
       DISCLOSE ANY OF GEC'S INFORMATION IN BREACH OF THE
       AGREEMENT…………………………………………………………….    33

CONCLUSION……………………………………………………………    34

# TABLE OF AUTHORITIES

## Cases

Adelson v. Hananel, 641 F. Supp. 2d 65, 83 (D. Mass. 2009) ..................................................... 20

Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 585 (3d Cir. 2009)............................ 20

AMP, Inc. v. Fleischhacker, 823 F.2d 1199, 1202 (7th Cir. 1987) ............................................. 23

Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 78 (D. Mass. 2004) ................................ 20

Bank v. IBM, 145 F.3d 420, 424 (1st Cir. 1998).......................................................................... 24

Bukuras v. Mueller Group, LLC, 592 F.3d 255, 262 (1st Cir. 2010) .......................................... 22

Caggiano v. Marchegiano, 99 N.E.2d 861, 864 (Mass. 1951)............................................... 20, 22

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) .................................................................... 19

Center Garment Co. v. United Refrigerator Co., 369 Mass. 633, 638 (1976) ................. 30, 33, 34

Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995).................................... 24, 25

Consumer Incentive Serv. v. Memberworks, Inc., CV990362655, 2003 Conn. Super. LEXIS
    3381, at *15 (Conn. Super. Ct. Dec. 8, 2003). ..................................................................... 21

Coutinho-Boisse Funeral Home, LLC v. Hamel, Wickens & Troupe Funeral Home, Inc., No.
    BACV2003-0653, 2008 Mass. Super. LEXIS 337, at *19
    (Mass. Super. Ct. Sept. 17, 2008).......................................................................... 30, 33, 34

Cygan v. Megathlin, 96 N.E.2d 702, 703 (Mass. 1951) ............................................................... 20

Dardovitch v. Haltzman, 190 F.3d 125, 139 (3d Cir. 1999) ........................................................ 22

Dialogo, LLC v. Bauza, 456 F. Supp. 2d 219, 226 (D. Mass. 2006)........................... 30, 32, 33, 34

First Health Group Corp. v. Nat'l Prescription Adm'rs, Inc., 155 F. Supp. 2d 195, 229 (M.D. Pa.
    2001)...................................................................................................................................... 23

Gambino v. Richard W. Reid Electrical Co, Inc., No. 07-11530-RWZ, 2008 U.S. Dist. LEXIS
    4256, at *5-6 (D. Mass. Jan. 18, 2008) ................................................................................ 28

Lawyers Title Insurance Corp. v. U.S. Fidelity & Guaranty Co., 122 F.R.D. 567, 569 (N.D. Cal.
    1988)...................................................................................................................................... 22

Lease-It, Inc. v. Mass. Port Auth., 600 N.E.2d 599, 602 (Mass. App. Ct. 1992) ........................ 30

Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 53-54 (1st Cir. 2001) ..................... 24, 26

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986) ..................... 18

Nucor Corp. v. Bell, 482 F. Supp. 2d 714, 729-730 (D.S.C. 2007);.............................................. 23

Piercing Pagoda, Inc. v. Hoffner, 351 A.2d 207, 210 (Pa. 1976). ................................................ 23

Quintin Vespa Co. v. Construction Serv. Co., 179 N.E.2d 895, 899 (Mass. 1962).......... 30, 33, 34

Reynolds v. Univ. of Pa., No. 06-1237, 2010 U.S. Dist. LEXIS 113198, at * 58 (E.D. Pa. Oct. 25, 2010).................................................................................................................................... 20

Serv. Ctrs. of Chicago, Inc. v. Minogue, 535 N.E.2d 1132, 1137 (Ill. App. 1989)..................... 23

United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam) ....................................... 19

Viad Corp. v. Cordial, 299 F. Supp. 2d 466, 477 (W.D. Pa. 2003).............................................. 23

Westec Security Serv., Inc. v. Westinghouse Elec. Corp., 538 F. Supp. 108, 121 (E.D. Pa. 1982) .................................................................................................................................................... 23

**Other Authorities**

23 S. Williston, Contracts §63.3 at 443 (4th ed. 2002).................................................... 30, 33, 34

Restatement (Second) Contracts, § 188 ........................................................................................ 23

**Rules**

Fed. R. Civ. P. 56(c) .................................................................................................................... 19

Fed. R. Civ. P. 56(e) .................................................................................................................... 19

Defendants Holtec International ("Holtec") and Holtec Manufacturing Division, Inc. ("Holtec Manufacturing") (collectively, "the Holtec Companies") submit this memorandum in support of their motion for summary judgment that the Confidentiality and Non-Circumventure Agreements ("Agreements" or "Agreement") they entered into with plaintiff Global Energy Consultants, LLC ("GEC") are unenforceable and not breached by the Holtec Companies. This memorandum is supported by the declarations of Dr. Kris Singh and Glen M. Diehl Esq.

## INTRODUCTION

GEC and the Holtec Companies signed the Agreements in September and October 2001. The Agreements include mutual confidentiality and non-circumvention clauses. GEC claims the Holtec Companies breached the Agreements by pursuing spent nuclear fuel ("SNF") storage projects in Ukraine and Switzerland.

The Agreements, however, are not enforceable because key terms are hopelessly indefinite. For example, with respect to the non-circumvention clause, not even GEC can state a consistent and non-contradictory definition of what it understood "circumvention" to mean. The evidence shows that, from 2003 to July 2010, GEC understood the non-circumvention clause to prohibit the Holtec Companies from communicating or negotiating with third parties regarding SNF storage opportunities in Europe without GEC, which occurred more than four years before this suit was filed. Once the Holtec Companies filed their summary judgment motion that GEC's cause of action violated the statute of limitations, GEC attempted to revise its understanding of "circumvention" in a transparent attempt to avoid its statute of limitations violation. GEC's revised understanding is that that circumvention was the signing of a contract for SNF storage in Europe without compensating GEC. GEC's changing definitions of "circumvention" prove its meaning in the Agreement is uncertain and therefore unenforceable. The Agreements are also

unenforceable because they have no geographic or time limits and are an unreasonable restraint on trade.

Alternatively, even if the Agreements are enforceable, they are, at best, ambiguous as to their scope. Thus, extrinsic evidence is properly considered on this point. That evidence unquestionably demonstrates that GEC described its "business plan" to the Holtec Companies as establishing "an international, interim (100 year) SNF storage facility." In an "international" SNF storage facility, SNF is transported across international borders and stored in a "host country." At least politically, this is a much more difficult concept than one country storing its own SNF domestically, which the Holtec Companies had pursued before 2001. The Holtec Companies considered GEC's business plan of establishing an "international" SNF storage facility to be an "absurd idea" and never pursued it.

But even if the Agreements were broad enough to cover any of the Holtec Companies' subsequent activities (which they are not), GEC's acts in November 2001 and in 2002 breached the Agreements. GEC acted as if the non-circumvention obligations in the Agreement were not mutual. GEC communicated, negotiated and signed contracts with competitors of the Holtec Companies for SNF storage opportunities in Europe. Under any definition of "circumvention," GEC's acts with the Holtec Companies' competitors "circumvented" the Holtec Companies and terminated any obligation the Holtec Companies may have owed to GEC under the Agreements.

As to the confidentiality clauses in the Agreements, the Agreements terminated in November 2001 and any confidentiality obligation the Holtec Companies had to GEC ended then. Further, GEC's own documents make it clear that GEC was the party misusing information to evaluate competitors – the Holtec Companies did not misuse any of GEC's protected information.

## STATEMENT OF FACTS

### A.      Holtec Had Substantial Experience Before October 2001

Holtec was founded in 1986 by Dr. Kris Singh.  (Diehl Decl. ¶ 2, Ex. 1, Singh Dep. Tr. at 20:2-3.)   Holtec is an engineering company that provides capital equipment and consulting services to fossil and nuclear power plants.  (Id. at 24:16-22.)   Holtec's capital equipment includes transport and storage casks, transfer casks and multi-purpose canisters ("MPCs") which are used to transport and store SNF from nuclear power plants.  (Id. at 88:21-90:2.)  Holtec was "actively bidding all over the world shortly after" being formed.  (Id. at 34:24-25.)  Holtec was operating overseas almost immediately upon starting business.  For example, by 1988, Holtec had won a large contract in Taiwan to provide equipment to a nuclear power plant.  (Id. at 34:8-24.)  Holtec made numerous bids in the 1990s in Europe for SNF storage projects.  (Id. at 43:4-17.)  For example, Holtec bid on SNF storage projects in Dukovany, Czechoslovakia in 1992 (Id. at 45:14-46:7) and in Ukraine in the late 1990s.  (Id. at 41:20-42:14.)

### B.      GEC Pursues "International" SNF Storage With The Stanton Group In 2001

Mr. Jones formed GEC after being laid off in November 2000.  (Diehl Decl. ¶ 3, Ex. 2, Jones Dep. Tr. at 25:5-21.)  Mr. Jones brought the concept of establishing an "international" SNF storage facility to The Stanton Group.  (Id. ¶ 4, Ex. 3, Browne Dep. Tr. at 28:3-13.)  Dr. Stephen Browne, the head of The Stanton Group, testified that the concept involves a facility in a host country storing SNF from multiple countries.  (Id. at 16:17-17:20.)  GEC and The Stanton Group also referred to the concept as a "centralized, multi-national" or an "international, centralized" SNF storage facility, indicating that multiple countries are involved.  (Id. ¶ 5, Ex. 4 at p. 3.)  The concept of an "international" SNF storage facility was not new and was "common knowledge" in the industry by 2001.  (Id. Ex. 3, Browne Dep. Tr. at 16:6-16; 18:1-3; Ex. 1, Singh Dep. Tr. at

52:24-53:1.)  This "international" SNF storage facility concept is different than "domestic" SNF storage facilities, which Mr. Jones described as "storage of fuel within its own country." (Id. Ex. 2, Jones Dep. Tr. at 418:23-24.)

The Stanton Group and GEC prepared at least two documents that plainly demonstrate that, in 2001, they were pursuing the concept of establishing an "international" SNF storage facility where a host country would store SNF from other countries.  The first document, dated January 23, 2001, is entitled "Proposal Outline – Nuclear Waste Storage at Chernobyl NPP." (Diehl Decl. ¶ 6, Ex. 5 and Ex. 2, Jones Dep. Tr. at 85:15-86:6.)  In this document, the project is described as "a long term (100 years) storage facility for international spent nuclear fuel."  (Id. Ex. 5 at p. 2, emphasis added.)  The document plainly explains that multiple countries would be involved in GEC's plan by stating a bank "would be asked to process payments from utilities or governments to appropriate Ukraine authorities."  (Id. at p. 4, emphasis added.)

The second document is dated August 16, 2001 and is entitled "Feasibility Analysis – International Interim Storage of Spent Nuclear Fuel."  (Diehl Decl. ¶ 7, Ex. 6, emphasis added, and Ex. 2, Jones Dep. Tr. at 458:20-461-5.)  The title of this document alone confirms that the project GEC and The Stanton Group were working on was for an "international" SNF storage facility.  This document also includes an Executive Summary describing "an effective system for storing and disposing of spent nuclear fuel" as having "a number of key characteristics."  (Id. Ex. 6 at p. 3.)  According to the document, those key characteristics included "internationally acceptable interim SNF storage" with a long horizon and appropriate "host country" infrastructure.  (Id., emphasis added.)  The specification of a "host country" clearly shows GEC's plan involved a country hosting other countries' SNF.

The Feasibility Study also makes clear that in 1997, even though the concept of an "international" SNF storage facility was known, "only national solutions to problems of <u>individual countries</u>" were being actively pursued.  (Diehl Decl. Ex. 6 at pp. 11-12, emphasis added.)  The Feasibility Study also notes at least one reason why an "international" SNF storage facility had not been successfully pursued:

> Why, then, have we not already seen a successful internationalization of this problem?  It is because of the reality of two clashing physical constraints:  The half-life of spent fuel (an unalterable fact) far exceeds the life expectancy of any individual, and most governments . . .  Why then should the politician campaign on behalf of voters who have not even been born yet?

(<u>Id</u>. Ex. 6 at p. 11.)

### C.    GEC Signed The Agreement With Holtec In October 2001

In a letter dated September 18, 2001, GEC wrote Holtec to inquire as to Holtec's interest in a "business plan" that GEC was "currently working" on:

> I am currently working with a very experienced power project developer, with whom I have developed <u>a major potential business plan</u>.  Included in this plan is the need for a quality U.S. designer and U.S. fabricator.  To this end we would like to solicit your interest in participating on a team that is being formed  . . .
>
> I enclose a confidentiality and non-circumventure agreement for your consideration.  If you agree that <u>this opportunity</u> may interest you, please sign two copies and return to me.  We would then offer to travel to your offices to discuss our plans in detail.

(Diehl Decl. ¶ 8, Ex. 7, emphasis added, and Ex. 2, Jones Dep. Tr. at 64:2-10, emphasis added.)  The business plan turned out to be the "international" SNF storage facility GEC had been pursuing.

5

Holtec signed the Agreement in October 2001.  (Diehl Decl. ¶ 9, Ex. 8.)  The Agreement was prepared by GEC.  (<u>Id</u>. Ex. 2, Jones Dep. Tr. at 62:5-63:5.)  Holtec signed the Agreement without negotiation, amendment or modification.  (<u>Id</u>. at 63:6-12.)

The Agreement included confidentiality and non-circumvention provisions:

> To assist the parties in their evaluations of a possible relationship with each other related to various possible businesses, and arrangements; and during the conduct of business resulting from said evaluations or other considerations, each party ("Discloser") will provide certain nonpublic information, concepts and ideas ("Information") to the other party ("Recipient") on the terms and conditions set forth herein.
> . . .
>
> 1.  For purposes of this Agreement, "Information" is that which is provided by Discloser to Recipient from and after the date hereto in written, visual of oral form including, without limitation, proprietary documents relating to the purpose described above, and any new endeavors which may, or may not, be related.
>
> 2.  Recipient shall maintain Information received in confidence and not disclose such Information or transmit any documents or copies containing such Information to any third party except as permitted below.
>
> 3.  Recipient will use Information received only for the purpose of evaluating the possible transaction describe above. . .
>
> 8.  Each party acknowledges that Holtec and GEC may be in similar businesses, and are not constrained by the Agreement with respect to other business activities except solely to the extent of the express prohibitions contained herein.  Each party further agrees to not circumvent the other party, or to circumvent the other party to the other party's clients without written authorization.

(Diehl Decl. ¶ 9, Ex. 8.)

Thus, the Agreement references "a possible relationship with each other related to various possible businesses, and arrangements," but nowhere specifies what those "possible businesses" or "arrangements" are.  GEC's Mr. Jones admitted that the Agreement does not specify what

business was involved.  (Diehl Decl. Ex. 2, Jones Dep. Tr. at 94:20-95:14.)  When asked whether

the use of the word "transaction" in the singular form in paragraph 3 of the Agreement implied

that the Agreement related to a single transaction, Mr. Jones replied:  "If the word is singular, it's

singular."  (Id. at 105:19-25.)

 Six days after the Agreement was signed, Mr. Jones sent an email with the subject "FW:

Agreement" to Mr. Michael McNamara of Holtec.  (Diehl Decl. ¶ 10, Ex. 9 and Ex. 2, Jones

Dep. Tr. at 64:18-65:4.)  Mr. Jones testified that this email described the business plan offered to

Holtec.  (Id. Ex. 2, Jones Dep. Tr. at 94:20-95:17.)  The email, in part, stated:

> Thank you very much for the signed confidentiality agreement and
> your request for additional information.
>
> I would like to give you a brief overview of our project. . . . I have
> a company called Global Energy Consultants, LLC (GEC) . . .
>
> I am also Vice President, Nuclear Power Programs, for The
> Stanton Group . . .
>
> My concept is to establish an international, interim (100 year) SNF
> storage facility.  We are pursuing three companion facilities:
> Lithuania, Ukraine and Kazakhstan – and have had discussions at
> their highest levels of government.

(Id. Ex. 9, emphasis added.)   Thus, the email clearly and plainly describes the "business plan"

presented to Holtec as the establishment of an "international" SNF storage facility at three

potential locations.   The email further stated:

> Revenues resulting from these programs may be used to develop
> new plant builds and T&D infrastructure at Ignalina (Unit 3);
> Khmelnitsky 3, 4 and up to three new plants in Kazakhstan.  I
> attach the executive summary from a recent Feasibility Analysis
> which I prepared for The Stanton Group.[1]

---

[1] Ignalia is a nuclear power plant located in Lithuania.  Khmelnitsky is a nuclear power
plant located in Ukraine.

(Id.)   Hence, the description of the project GEC sent Holtec specifically described additional projects that could follow from the revenues of the successful implementation of the "international" SNF storage facility project.

GEC attached an Executive Summary to this email as well.  (Diehl Decl. ¶ 11, Ex. 10 and Ex. 2, Jones Dep. Tr. at 65:5-66:16.)  This Executive Summary was the same one generated by GEC and the Stanton Group in August of 2001.  (Id. Ex. 6 at pp. 2-5.)  The Executive Summary that GEC attached to the prior email and sent to Holtec further described the "international" SNF storage facility project:

> Stanton's Spent Nuclear Fuel program proposes a politically and economically feasible solution to the present and growing problem of handling the <u>World's</u> spent nuclear fuel (SNF).
> . . .
> ELEMENTS OF AN IDEAL SITUATION
> . . .
> • **Host Country Infrastructure**   The host country would have a credible technological infrastructure to accept suitable technology transfer.
>
> • **Host Country Acceptability** The host country would prove that it is ready, willing and able to be a peaceful member of the international community and would commit to not reprocessing the stored SNF
> . . .
> THE STANTON SPENT NUCLEAR FUEL PROGRAM
> The Stanton Group SNF interim storage program meets the main objectives of an <u>internationally</u> acceptable service for handling the interim storage and eventual disposition of spent nuclear fuel. Stanton has presented the elements of this program to key persons in government, utilities and the private sector and received universal encouragement to implement this service. . . .

(Id. Ex. 10, at p. 2, emphasis added.)   The references to the "World's" SNF and to a "Host Country" confirm that GEC was proposing an "international" SNF storage facility where a host country would store SNF from a number of countries.

8

As a result of GEC's initial letter, email and Executive Summary, Holtec understood GEC's "business plan" was for an "international" SNF storage facility.  (Diehl Decl. Ex. 1, Singh Dep. Tr. at 52:17-53:24; 55:22-56:6 and 58:25-60:15.)  When Holtec's Dr. Singh heard about GEC's business plan, he was not interested and did not think it would ever be implemented.  (Id. at 52:17-53:24.)  Further, he considered the business plan an "absurd idea."  (Id. at 59:7-14.) Holtec has never pursued an "international" SNF storage facility wherein one nation accepts and stores SNF from other nations.  (Id. Ex. 1, Singh Dep. Tr. at 59:7-9 and Singh Decl. ¶¶ 3 and 5.)

### D.   GEC Signed The Same Agreement With Holtec Manufacturing

GEC also signed an Agreement with U.S. Tool & Die, Inc. ("U.S. Tool & Die").  (Diehl Decl. ¶ 12, Ex. 11.)  Holtec bought U.S. Tool & Die in 2004 and renamed it Holtec Manufacturing.  (Id. Ex. 1, Singh Dep. Tr. at 31:21-25.)  For the sake of simplicity, U.S. Tool & Die shall be referred to as Holtec Manufacturing hereinafter.

GEC's Agreement with Holtec Manufacturing has the same terms as its Agreement with Holtec.  (Diehl Decl. Exs. 8 and 11; Ex. 2, Jones Dep. Tr. at 122:3-23.)  The exchange of information between GEC and Holtec Manufacturing followed the same pattern as it did with Holtec.  On or about September 27, 2001, Holtec Manufacturing sent a signed Agreement to GEC.  (Id. ¶ 13, Ex. 12 and Ex. 2, Jones Dep. Tr. at 123:12-125:6.)  Then, on or about October 5, 2001, GEC sent an email with an attached Executive Summary to Holtec Manufacturing to explain the project.  (Id. ¶ 14, Ex. 13 and Ex. 2, Jones Dep. Tr. at 127:21-129:3.)  The subject matter of the email was "Agreement."  (Id. Ex. 13.)  This email and the attached Executive Summary were similar to the ones sent to Holtec.  (Id.)  The email included Mr. Jones' statement that "my concept is to establish an international, interim (100 year) SNF storage facility."  (Id.)

GEC's state of mind at the time the Agreement was signed was clarified by Mr. Jones' deposition testimony.  Mr. Jones testified that the document sent to Holtec Manufacturing that immediately followed the signing of the Agreement – the email with the subject matter "Agreement" -- "told the recipients, what the idea was, what the plan was . . . What the subject of the business opportunity was."  (Diehl Decl. Ex. 2, Jones Dep. Tr. at 59:11-60:19.)

Holtec Manufacturing has not pursued an "international" SNF storage facility project where a facility in one nation stores SNF from other nations.  (Singh Decl. ¶¶ 3 and 6.)

### E.  GEC Meets With The Holtec Companies On November 13, 2001

GEC's Mr. Jones arranged for a meeting between GEC, The Stanton Group and the Holtec Companies on November 13, 2001.  (Diehl Decl. ¶ 15, Ex. 14 and ¶ 16, Ex. 15.)  The discussion at that meeting, and GEC's and The Stanton Group's state of mind following the meeting, is reflected in correspondence between GEC and The Stanton Group regarding a follow-up letter to the Holtec Companies.  (Id. ¶ 5, Ex. 4.)  That correspondence indicates that the November 13, 2001 meeting occurred and was meant to summarize "the key points in our conversation."  (Id. at p. 2 of the exhibit.)  It describes the project roles offered to the Holtec Companies as "Casks and canisters fabrication" and "SNF Transport and logistics."  (Id. at pp. 3-4 of the exhibit.)  It also clearly indicates that the "international" SNF storage facility concept was the business plan proposed to the Holtec Companies by stating:

- "The nations selected . . . will be credible long-term hosts to customers, suppliers and policy makers for interim SNF storage."  (Id. at p. 3 of the exhibit, emphasis added.)

- The project "is a <u>centralized, multinational</u> ISFSI [Independent Spent Fuel Storage Installation] that will become a major factor in <u>world</u> spent fuel activity." (<u>Id</u>. at p. 2 of the exhibit, emphasis added.)

- "Holtec can provide and manage the transportation of spent fuel from . . . <u>international</u> customers to the three storage sites." (<u>Id</u>. at p. 4 of the exhibit, emphasis added.)

### F.  GEC Signs Agreement And Meets With <u>Transnuclear In November 2001</u>

Just one week after meeting with the Holtec Companies, GEC signed a Confidentiality and Non-Circumventure Agreement with Holtec's competitor Transnuclear, Inc. ("Transnuclear").  (Diehl Decl. ¶ 17, Ex. 16 and Ex. 2, Jones Dep. Tr. at 300:9-301:10; 312:8-16 and 316:13-24.)  GEC's agreement with Transnuclear has terms identical to the Agreement GEC signed with the Holtec Companies.  (<u>Id</u>. Exs. 8 and 16 and Ex. 2, Jones Dep. Tr. at 300:9-301:10.)  After Transnuclear signed the agreement, GEC told Transnuclear its business plan was "to establish an international, interim spent nuclear fuel storage facility."  (<u>Id</u>. ¶ 18, Ex. 17.) GEC also sent the Executive Summary describing the "international" SNF storage facility concept to Transnuclear and arranged for a meeting with Transnculear on November 30, 2001. (<u>Id</u>. ¶ 19, Ex. 18 and Ex. 2, Jones Dep. Tr. at 323:3-329:10.)

As was the case with the Holtec Companies, the subject matter of the meeting with Transnuclear, and GEC's and The Stanton Group's state of mind, is reflected in correspondence between GEC and The Stanton Group regarding a follow-up letter to Transnuclear.  (Diehl Decl. ¶ 20, Ex. 19.)  That correspondence indicates that the November 30, 2001 meeting with Transnuclear occurred.  (<u>Id</u>.)  It also indicates that GEC and The Stanton Group offered the same roles to Transnuclear that they already offered the Holtec Companies, including "Cask and

11

canister fabrication" and "SNF Transport and Logistics."  (Id. at p. 4 of the exhibit.)  GEC and

The Stanton Group also confirmed that they discussed the business plan for the "international"

SNF storage facility with Transnuclear by repeating the description of the project as "a

centralized, multinational ISFSI that will become a major factor in world spent fuel activity."

(Id. at p. 2 of the exhibit, emphasis added.)

### G. GEC and The Stanton Group Abandon The Business Plan of "International" SNF Storage In 2002

By 2002, after discussing the concept with representatives from several nations, The

Stanton Group concluded that the business plan for an "international" SNF storage facility was

not feasible.  (Diehl Decl. Ex. 3, Browne Dep. Tr. at 18:13-25:7 and 42:12-18.)  As a result, The

Stanton Group started to pursue domestic, "centralized" SNF storage facilities.  (Id. at 48:6-

50:3.)  At his deposition, Dr. Browne was very clear that The Stanton Group had abandoned the

"international" SNF storage facility concept.  (Id.)  At least by February 2002, GEC reached a

similar conclusion and decided not to pursue the "international" SNF storage facility business

plan:

> . . . we have divided the program into three phases.  SNF at Zap;
> central[ized] SNF storage in Ukraine; and international SNF
> storage in Chernobyl, we think it is safe to proceed with the first
> one now, keeping the second two quiet.

(Id. ¶ 21, Ex. 20, emphasis added.)  In August 2002, GEC's Mr. Jones again admitted that GEC

had "switched from looking at international storage to solving individual problems for individual

states."  (Id. ¶ 22, Ex. 21, emphasis added.)  Further, GEC admits that it modified its business

plan in response to request for proposals issued by European entities "to concentrate on

developing country specific SNF storage projects rather than an international site."  (Compl. ¶¶

22-23, emphasis added.)  However, the only business plan presented to the Holtec Companies in

October and November 2001 was the business plan to establish an "international, interim (100 year) SNF storage facility." (Id. Exs. 9 and 13.)

### H.     GEC's Parallel Pursuit of the Holtec Companies and Transnuclear Continues in 2002

GEC admits to pursuing the participation of the Holtec Companies and Transnuclear for a SNF storage project in 2002 at the same time.  For example, GEC's Mr. Jones wrote in an email that "I want to keep open the . . . promise to meet with Transnuclear, and pursue in parallel.  I will approach Alan Hanson [of Transnuclear] again after we have set a date with Moscardini [of Holtec Manufacturing] and Holtec."[2]  (Diehl Decl. ¶ 23, Ex. 22, emphasis added.)

In fact, GEC preferred Transnuclear over Holtec.  (Diehl Decl. Ex. 3, Browne Dep. Tr. at 59:19-63:12.)  GEC admitted to being "reluctant to offer services to Holtec" while having "already offered GEC personnel to TN [Transnuclear]." (Id. ¶ 24, Ex. 23.)  GEC's Mr. Jones even testified that GEC evaluated a number of storage canister providers, including Holtec and Transnuclear, at the same time, despite having signed Confidentiality and Non-Circumvention Agreements with both Holtec and Transnuclear:

> Q:     Now, were you considering Transnuclear as an alternative to Holtec at this time?
> A:     I was considering the various MPC vendors to determine which one was the best to put on the team to pursue business in Europe.
> Q:     Okay. So you were considering whether Transnuclear was better than Holtec, or vice versa, whether Holtec was better than Transnuclear?
> A:     That's correct; and others.
> Q:     And others. Which others?
> A:     NAC International, for one.

---

[2]     Mr. Jones testified that Alan Hanson was the head of Transnuclear.  (Id. Ex. 2, Jones Dep. Tr. at 336:16-18.)

13

Q:      Anybody else you remember?
A:      Possibly Vectra.
…
Q:      Let me make sure I understand. <u>You were considering Holtec and Transnuclear for similar roles in that project</u>?
A:      <u>For similar roles, yes.</u>
Q:      <u>Could they both participate</u>?
A:      <u>No</u>.
Q:      <u>It was one or the other</u>?
A:      <u>It was one or the other, or even another.</u>
. . .
Q:      So you were pursuing Transnuclear and Holtec in parallel?
[objection omitted]
A:      Yes

Q:      <u>GEC was</u>?
A:      <u>Yes</u>.
Q:      <u>And you were pursuing Transnuclear and Holtec in parallel after both had signed non-circumvention agreements with GEC, correct</u>?
A:      <u>Yes</u>.

(<u>Id</u>. Ex. 2, Jones Dep. Tr. at 324:11-333:17, emphasis supplied.)

As late as March 8, 2002, GEC was asking itself the question "To TN [Transnuclear], or not to TN." (Diehl Decl. ¶ 25, Ex. 24.) GEC's understanding that it had no obligations to the Holtec Companies under the Agreement was clear: "I personally feel that it is too early to give up following parallel paths." (<u>Id</u>.) This was because GEC and The Stanton Group "learned something very important each time" they met with the Holtec Companies and Transnuclear. (<u>Id</u>.)

14

## I.    __GEC Pursues Holtec Manufacturing's Competitors__

GEC also pursued Holtec Manufacturing's competitors to participate on SNF projects in 2002.  In January 2002, Mr. Jones prepared a memorandum summarizing "some of the strategies we are developing in pursuit of the nuclear market."  (Diehl Decl. ¶ 26, Ex. 25 and Ex.2, Jones Dep. Tr. at 356:17-357:9.)  It that memorandum, Mr. Jones admits to pursuing two fabricators of SNF storage casks:  "US Tool and Die (US) or OMV (Sweden)."[3]  (Id. Ex. 25 at p. 3.)  In another email in January 2002, GEC's Mr. Jones admitted that he did not "like to put all may [sic] eggs in one basket" and inquired about pursuing OMV as well as Holtec Manufacturing.  (Id. ¶ 27, Ex. 26 and Ex. 2, Jones Dep. Tr. at 338:1-16.)

At his deposition, Mr. Jones confirmed that GEC was pursuing at least two different fabricators of SNF canisters at the same time:

> Q:    On the project that you were looking at in late 2001, 2002 time frame, you were considering both U.S. Tool and Die [Holtec Manufacturing] and OMV, correct?
>
> [objection omitted]
>
> A:    As fabricators, yes.
> Q:    And as fabricators of what?
> A:    Spent nuclear fuel transportation and storage casks.
> Q:    And was there room for both on the team?
>
> [objection omitted]
>
> A:    That hadn't been established.

---

[3]    This document mentions Transnuclear (on p. 2) but does not even mention Holtec, confirming GEC's preference of Transnuclear over Holtec.  (Diehl Decl. Ex. 25.)  Also, as mentioned above, U.S. Tool and Die became Holtec Manufacturing.

(Diehl Decl. Ex. 2, Jones Dep. Tr. at 332:9-333:1.)  GEC had signed a confidentiality agreement with OMV in November 2001.  (Id. ¶ 28, Ex. 27.)

###    J.    GEC'S Changing Contentions As To The Meaning Of Circumvention

GEC accuses the Holtec Companies of circumventing GEC in breach of the Agreements. From 2003 until October 2010 – just before discovery in this case closed – GEC understood the non-circumvention clause in the Agreements prevented the Holtec Companies from communicating or negotiating with third parties to pursue European SNF opportunities without GEC.[4]  GEC also stated this understanding in response to interrogatories served in July 2009. (Diehl Decl. ¶ 29, Ex. 28 at p. 5.)  Additionally, GEC's president, Mr. Jones, testified that this was his and GEC's understanding in 2003 and 2004.  As his deposition, Mr. Jones testified that the following acts by Holtec circumvented GEC:[5]

- Holtec's March 7, 2003 letter to The Stanton Group regarding Holtec Europe. (Diehl Decl. ¶ 30, Ex. 29 and Ex. 2, Jones Dep. Tr. at 132:18-135:12 and 138:21-139:2.)

- Holtec's July 14, 2003 and August 1, 2003 letters to BNFL regarding SNF in Europe.  (Id. ¶ 31, Exs. 30 and 31; Ex. 4, GEC response to interrogatories at p. 5; and Ex. 2, Jones Dep. Tr. at 190:25-192:25.)

- Holtec's September 2003 pre-qualification bid submission to Energoatom in the Ukraine. (Compl. ¶¶ 37, 39 and 74; Diehl Decl. Ex. 2, Jones Dep. Tr. at 112:8-113:12.)

---

[4]    GEC's contentions are also described in the Holtec Companies' Memorandum in Support of their Motion for Summary Judgment on their statute of limitations defense (Dkt. No. 33) and in the associated Reply Brief (Dkt. No. 50).

[5]    Mr. Jones was deposed on April 28, 2010 and on October 22, 2010.  Mr. Jones also testified as a 30(b)(6) witness for GEC on October 22, 2010.  Mr. Jones confirmed that GEC adopted Mr. Jones' testimony as to what constituted "circumvention."  (Diehl Decl. Ex. 2, Jones Dep. Tr. at 478:1-15.)

- Holtec's October 2003 letter to Energoatom in Ukraine.  (Diehl Decl. ¶ 32, Ex. 32; Ex. 4, GEC response to interrogatories at p. 5; and Ex. 2,  Jones Dep. Tr. at 295:25-296:13.)

- Holtec's October 2003 letter to U.S. Ambassador Herbst.  (Id. ¶ 33, Ex. 33; Ex. 4, GEC response to interrogatories at p. 5; and Ex. 2, Jones Dep. Tr. at 298:5-11.)

- Holtec's January 8, 2004 email to Mr. Hellstrom and Mr. Jones of GEC and Holtec's decision to work directly with the customer without GEC.  (Id. ¶ 34, Ex. 34 and Ex. 2, Jones Dep. Tr. at 248:21-249:24.)

GEC also admits that its understanding that any communications or negotiations by the Holtec Companies on European SNF projects without GEC were prohibited by the Agreement reflect GEC's understanding of the Agreement in the 2003-2004 timeframe.  Mr. Jones testified at his deposition that he saw a copy of Holtec's letter dated March 7, 2003 to The Stanton Group regarding Holtec Europe (Diehl Decl. Ex. 29) within "several days" after it was sent (Id. Ex. 2, Jones Dep. Tr. at 146:4-147:4).  Mr. Jones further testified that, after seeing the letter, he immediately told a Holtec employee that it was an act of "circumvention" by Holtec.  (Id.)  As another example, in early 2004, Mr. Jones wrote in his notebook that "Holtec has circumvented GEC."  (Id. ¶ 35, Ex. 35, emphasis added.)

Since the acts GEC understood to be circumvention occurred more than four years before this suit was filed, the Holtec Companies, in July 2010, filed a summary judgment motion contending that GEC's suit violated the statute of limitations for breach of contract actions.  (Dkt. No. 33.)  GEC waited until October 21, 2010 to serve supplemental interrogatory responses that dramatically changed its contentions as to the meaning of "circumvention" in a transparent attempt to avoid the statute of limitations.  (Diehl Decl. ¶ 36, Ex. 36 at pp. 4-5.)  In the supplemental interrogatory responses, the acts listed above are no longer described as "circumvention."  (Id.)  Instead, according to GEC's new view, circumvention is the signing of a

17

contract relating to European SNF without compensating GEC.  (Dkt. No. 48 at p. 1 and Diehl Decl. Ex. 2, Jones Dep Tr. at 562:16-19.)

The day after GEC served the supplemental interrogatory responses, the deposition of Mr. Jones continued on October 22, 2010.  At his continued deposition, Mr. Jones confirmed that GEC changed its view as to what constituted "circumvention" under the Agreement.  (Diehl Decl. Ex. 2, Jones Dep. Tr. at 562:12-563:6.)  However, Mr. Jones also re-confirmed his earlier testimony that, in 2003 and 2004, he and GEC understood "circumvention" to be communications with third parties without GEC to discuss SNF storage opportunities in Europe. (Id. at 567:1-22 and at 575:6-20.)

GEC further explained its new theory in its opposition to the Holtec Companies' summary judgment motion on the statute of limitations defense.  (Dkt. No. 48.)  GEC explained that it no longer believed that Holtec's "direct contacts and negotiations" were acts of "circumvention."  (Id. at p. 9.)  GEC attempted to justify its contradictory contentions by claiming that the opinions of GEC's president concerning the meaning of "circumvention" were merely impermissible lay opinions.  (Id. at pp. 6-7.)

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact. In such circumstances, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes

demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish the existence of a genuine issue of material fact.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-86 (1986).  The opposing party may not merely rely on denials in its pleadings, rather it must put forward evidence of specific facts in the form of affidavits and other admissible materials in support of its contention that a dispute exists.  Fed. R. Civ. P. 56(e).  In evaluating the evidence, the court draws all reasonable inferences from the facts in favor of the opposing party.  <u>Matsushita</u>, 475 U.S. at 587-88 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam)).

Nevertheless, the obligation is on the opposing party to produce a factual predicate as a basis for such inferences.  The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 586-87 (citations omitted).

## II.    <u>THE AGREEMENTS ARE UNENFORCEABLE</u>

### A.    **The Non-Circumvention Provisions Are Indefinite And Therefore Unenforceable**

Under the terms of the Agreements between the Holtec Companies and GEC, Massachusetts substantive law applies.[6]  (Diehl Decl. Exs. 1 and 3, para. 7.)  Pursuant to

---

[6]    For the reasons set forth in the Holtec Companies' summary judgment motion that GEC's contract claim violates the statute of limitations, Pennsylvania law applies to the statute of limitations defense.  (Dkt. No. 33.)

Massachusetts law, the determination of "whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court."[7]  <u>Armstrong v. Rohm & Haas Co.</u>, 349 F. Supp. 2d 71, 78 (D. Mass. 2004).  Under the law of Massachusetts, "all the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined."  <u>Cygan v. Megathlin</u>, 96 N.E.2d 702, 703 (Mass. 1951); <u>see Adelson v. Hananel</u>, 641 F. Supp. 2d 65, 83 (D. Mass. 2009) (for a valid contract "[t]here must be agreement on the essential terms of the transaction in order that the nature and extent of the parties' obligations can be determined and, hence, enforced.")  While unspecified terms will not automatically preclude the formation of a binding agreement, "it is essential to the existence of a contract that its nature and the extent of its obligations be certain.  This rule has been long established." <u>Caggiano v. Marchegiano</u>, 99 N.E.2d 861, 864 (Mass. 1951).

The non-circumvention clause in the Agreements between GEC and the Holtec Companies is indefinite.  It states: "Each party further agrees not to circumvent the other party, or to circumvent the other party to the other party's clients without written authorization."  (Diehl Decl. Exs. 8 and 11 at para. 8.)  Significantly, the term "circumvention" is not defined.  Its meaning is also not clarified by the Agreement.  There are no examples of what constitutes circumvention.  A court that has considered a non-circumvention contract such as the Agreements at issue here critically noted that the meaning of the term circumvent, without

---

[7]      The law in Massachusetts regarding indefinite contracts is virtually the same as the law in Pennsylvania.  <u>See Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 585 (3d Cir. 2009) ("Whether the terms of a contract are sufficiently definite is a question of law.").  <u>See also</u> <u>Reynolds v. Univ. of Pa.</u>, No. 06-1237, 2010 U.S. Dist. LEXIS 113198, at * 58 (E.D. Pa. Oct. 25, 2010) ("Where contractual terms are indefinite, the contract is unenforceable.")

further definition, is "nebulous."   See Consumer Incentive Serv. v. Memberworks, Inc., CV990362655, 2003 Conn. Super. LEXIS 3381, at *15 (Conn. Super. Ct. Dec. 8, 2003).

While the term "circumvention" is by itself indefinite, GEC's changing understanding of what constitutes "circumvention" further proves that the term is indefinite.  Significantly, not even GEC, who drafted the Agreement, can provide a certain and constant definition of "circumvention."  GEC's testimony (Diehl Decl. Ex. 2, Jones Dep. Tr. at 112:8-113:12; 132:18-135:12;   138:21-139:2;   190:25-192:25;   248:21-249:24;   295:25-296:13;   298:5-11)   and interrogatory responses (Id. Ex. 28 at p. 5) demonstrate that GEC considered communications or negotiations by the Holtec Companies with a third party in pursuit of SNF storage opportunities in Europe to be "circumvention," at least until October 2010.  Thus, according to GEC's understanding in 2003, Holtec's contact with The Stanton Group (id. Ex. 29), with BNFL (id. Exs. 30 and 31), with Energoatom in Ukraine (id. Ex. 32) and with U.S. Ambassador Herbst (id. Ex. 33), were all acts of circumvention by Holtec.

When confronted by the Holtec Companies' summary judgment motion on the statute of limitations issue (Dkt. No. 33), however, GEC changed its definition of "circumvention." According to GEC's new understanding, the "direct contacts and negotiations [by Holtec] could not be considered circumvention."[8]  (Dkt. No. 48 at p. 9.)  Instead, GEC now claims that

---

[8]      GEC's supplemental interrogatory responses do not list Holtec's contacts with The Stanton Group, BNFL, Energoatom, or Ambassador Herbst as "circumventions."  (Diehl Decl. ¶ 31, Ex. 31 at p. 6.)

"circumvention occurred when Holtec signed its agreement with clients, in other words, signed contracts, and did not compensate GEC."[9]  (Diehl Decl. Ex, 2, Jones Dep. Tr. at 562:16-19.)

Thus, the undisputed facts demonstrate that GEC, who drafted the Agreement, cannot define "circumvention" with any certainty.  GEC's changing and contradictory definitions of "circumvention" conclusively prove that the "nature and the extent of [the parties'] obligations" under the Agreements are uncertain and indefinite.  Caggiano, 99 N.E.2d at 864.  Accordingly, the non-circumvention provision in the Agreements are indefinite and unenforceable.[10]

## B.   The Agreements Are An Unreasonable Restraint On Trade

The Agreements include covenants not to compete.  To be enforceable in Pennsylvania, a covenant not to compete must be: (1) ancillary to an employment contract or to a contract for the sale of goodwill or other subject property, (2) supported by adequate consideration, (3)

---

[9]   GEC's new theory does not address Dr. Woodward's January 8, 2004 email where he told GEC's Mr. Jones that Holtec was going to work with a potential Swiss customer directly without GEC (Diehl Decl. Ex. 35) or the February 19, 2004 meeting between GEC and Holtec which, according to Mr. Jones, was the end of any relationship between the Holtec Companies and GEC (id. Ex. 2, Jones Dep. Tr. at 264:19-267:24).  Without question, by early 2004, GEC and Mr. Jones knew the Holtec Companies were moving ahead in Switzerland and Ukraine without GEC.

[10]   It is apparent that GEC's new position is a hindsight attempt to avoid the Holtec Companies' statute of limitations defense.  (Dkt. Nos. 33, 48 and 50.)  GEC has offered the excuse that Mr. Jones' testimony was inadmissible lay opinion testimony.  (Dkt. No. 48.)  But Mr. Jones' testimony and GEC's interrogatory responses are admissions.  Mr. Jones testimony as to his understanding in the 2003/2004 time frame is the best evidence of GEC's intentions under the Agreement.  See Bukuras v. Mueller Group, LLC, 592 F.3d 255, 262 (1st Cir. 2010) (Massachusetts law construes an agreement "in a manner which will effectuate the intent of the parties"); Dardovitch v. Haltzman, 190 F.3d 125, 139 (3d Cir. 1999) (the testimony of a party to a contract regarding his understanding of the parties' obligations and intent under the contract can be "significant evidence of the meaning of the contract").  GEC's attempt to reconstruct its understanding of the term circumvention has little relevance.  See Lawyers Title Insurance Corp. v. U.S. Fidelity & Guaranty Co., 122 F.R.D. 567, 569 (N.D. Cal. 1988) ("current opinion about the meaning of the contract language that was drafted several years ago is not overwhelmingly important").

reasonably necessary to protect legitimate interests of the purchaser and (4) reasonably limited in duration and geographic extent. <u>Viad Corp. v. Cordial</u>, 299 F. Supp. 2d 466, 477 (W.D. Pa. 2003); <u>Westec Security Serv. Inc. v. Westinghouse Elec. Corp.</u>, 538 F. Supp. 108, 121 (E.D. Pa. 1982) (applying rule of reason and citing to Restatement (Second) Contracts, § 188, and Comment a); <u>Piercing Pagoda, Inc. v. Hoffner</u>, 351 A.2d 207, 210 (Pa. 1976).  The Agreements are restrictions on competition that must be restricted to GEC's legitimate interests.  <u>See</u> Restatement (Second) Contracts, § 188.  Courts have also found confidentiality agreements lacking geographic or time limitations to be invalid restraints on trade.  <u>See, e.g., AMP, Inc. v. Fleischhacker</u>, 823 F.2d 1199, 1202 (7th Cir. 1987); <u>First Health Group Corp. v. Nat'l Prescription Adm'rs, Inc.</u>, 155 F. Supp. 2d 195, 229 (M.D. Pa. 2001).

In this case, the Agreements have <u>no</u> limits on their duration or on their geographic reach. (Diehl Decl. Exs. 8 and 11.)  Thus, any restrictions on competition are unenforceable.  Further, as written, the Agreements do not define what "Information" is with any certainty and GEC claims that <u>all</u> information it provided to the Holtec Companies is protected.  (<u>Id</u>. Ex. 2, Jones Dep. Tr. at 484-508.)  Such a broad definition of protected information amounts to a covenant not to compete.  <u>See Nucor Corp. v. Bell</u>, 482 F. Supp. 2d 714, 729-730 (D.S.C. 2007); <u>Serv. Ctrs. of Chicago, Inc. v. Minogue</u>, 535 N.E.2d 1132, 1137 (Ill. App. 1989) ("By defining confidential information as essentially all of the information provided . . . the confidentiality agreement amounts in effect to a . . . covenant not to compete which is completely unrestricted in duration or geographical scope.  This type of covenant is unreasonable and will not be enforced.")  Since there are no time or geographic limits, the Agreements are an unreasonable restraint on trade that should not be enforced.

III.   **THE GEC-HOLTEC AGREEMENT IS LIMITED TO "INTERNATIONAL" SNF STORAGE WHICH HOLTEC NEVER PURSUED**

Assuming, *arguendo*, that the circumvention term can be construed with certainty and that the Agreements are enforceable, then Holtec did not circumvent GEC because the Agreement was limited to a type of SNF storage facility that Holtec never pursued and because GEC ignored the terms of its own Agreement after meeting with Holtec, thereby terminating any obligation Holtec may have owed to GEC under the Agreement.

A.   **The Scope Of The Agreement Is Ambiguous**

Massachusetts substantive law governs the Agreement.  (Diehl Decl. ¶ 9, Ex. 8, para. 7.) "Under Massachusetts Law, interpretation of a contract is ordinarily a question of law for the court," and therefore appropriate for resolution on summary judgment. Bank v. IBM, 145 F.3d 420, 424 (1st Cir. 1998) (quoting Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)).  Contract terms are ambiguous if the "terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken." Coll, 50 F.3d at 1122.  When an agreement is ambiguous, extrinsic evidence can be admitted to construe the parties' intentions. See Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 53-54 (1st Cir. 2001).  If a contract's terms are ambiguous, summary judgment is appropriate "if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." Bank, 145 F.3d at 424 (internal quotation marks and citations omitted).

In this case, the scope of the Agreement is plainly ambiguous.  The ambiguity is demonstrated by the language of the Agreement.  The preamble of the Agreement states that its purpose is to "assist the parties in their evaluations of a possible relationship . . . related to various possible businesses, and arrangements and during the conduct of business resulting from

24

said evaluations or other considerations."  (Diehl Decl. Ex. 8.)  The phrase "various possible

businesses" is plainly ambiguous because it does not explicitly state what business is concerned.

GEC's Mr. Jones admitted this in his deposition.  (Id. Ex. 2, Jones Dep. Tr. at 94:20-95:14.)  The

Agreement does not cover "all businesses;" otherwise it would have plainly stated it related to

"all businesses."  The ambiguity is further confirmed by the language in paragraph 3 of the

agreement, which references a single transaction:  "Recipient will use Information received only

for the purpose of evaluating the possible transaction described above."  (Id. para. 3, emphasis

supplied.)  This language refers to transaction in the singular, suggesting that the Agreement

relates to a single transaction.  (Id. Ex. 2, Jones Dep. Tr. at 105:19-25.)  For at least these

reasons, the scope the Agreement is ambiguous because the phrase "various possible businesses"

is susceptible to more than one meaning.  See Coll, 50 F.3d at 1122.

GEC has also admitted that the Agreement is ambiguous:

> Q:   But you were – you had a non-circumvention agreement
>      with Holtec at this time?
> A:   Yes.
> Q:   And was that limited to international spent nuclear fuel
>      projects?
> A:   No.
> Q:   So in your view, it was more expansive than that?
> A:   I don't think the document was that definitive.

(Diehl Decl. Ex. 4, Jones Dep. Tr. at 325:15-326:3, emphasis added.)

The ambiguity is further confirmed by GEC's contentions.  According to GEC's latest

contention:

> The purpose of the Plan was to secure contracts for SNF storage
> projects in Europe . . . and the purpose of the Agreement was to
> prevent the Defendants from using the Plan to secure those
> contracts [in Europe] . . .

25

(Dkt. No. 48 at p.1, emphasis added.)  The Agreement does not mention any geographic area, let alone Europe, and it also does not mention SNF.  (Diehl Decl. Ex. 8.)  GEC's own contentions are admissions that the Agreement is limited in scope and geography.  Thus, GEC's own contentions demonstrate that the Agreement is ambiguous.

      **B.**     **<u>Extrinsic Evidence Explains The Ambiguity</u>**

Since the scope of the Agreement is ambiguous, extrinsic evidence can be admitted to construe the parties' intentions.  <u>Lohnes</u>, 272 F. 3d at 53-54.  The extrinsic evidence relevant to the Agreement includes a transmittal letter from GEC to Holtec (Diehl Decl. Ex. 7), an email from GEC to Holtec (<u>Id</u>. Ex. 9) and an Executive Summary attached to the email (<u>Id</u>. Ex. 10). This extrinsic evidence proves that the Agreement is limited to the concept of an "international" SNF storage facility located in Lithuania, Ukraine or Kazakhstan and to "new plant builds and T&D infrastructure at Ignalina (Unit 3); Khmelnitsky 3, 4 and up to three new plants in Kazakhstan" funded by revenues resulting from the international SNF storage facility.

GEC's introductory letter to Holtec stated that GEC had "developed <u>a major potential business plan</u>." (<u>Id</u>. Ex. 7, emphasis supplied and Ex. 2, Jones Dep. Tr. at 64:2-10.)  Thus, GEC's letter references a <u>single</u> business plan, confirming that GEC and Holtec intended the Agreement to have a limited scope.  Mr. Jones' letter states that "if you agree that this opportunity may interest you, please sign" the Agreement.  (<u>Id</u>. Ex. 7.)

After Holtec signed the Agreement, Mr. Jones emailed Holtec on or about October 23, 2001. (Diehl Decl. Ex. 9 and Ex. 2, Jones Dep. Tr. at 64:18-65:4.)  This email sheds further light on the scope of the Agreement intended by the parties.  It explicitly and unambiguously describes GEC's "business plan" by stating "My concept is to establish an <u>international</u>, interim (100 year) SNF storage facility."  (<u>Id</u>. Ex. 10 at p. 1, emphasis added.)  The concept of an

"international" SNF storage facility was well known by October 2001.  (Id. Ex. 1, Singh Dep. Tr. at 52:17-24 and Ex. 3, Browne Dep. Tr. at 16:6-16 and 18:1-3; Ex. 6 at p. 11.)  This concept involves a facility in a host country receiving SNF from one or more other countries for storage.  (Diehl Decl. Ex. 1, Singh Dep. Tr. at 52:17-24; 55:22-56:4 and 58:25-60:15 and Ex. 3, Browne Dep. Tr. at 16:6-16; 18:1-3.)  Thus, Mr. Jones' email leaves no doubt that GEC proposed a business plan for an "international" SNF storage facility to the Holtec Companies.  No other type of SNF storage concept, other than the "international" SNF storage facility, is mentioned in Mr. Jones' email.

Mr. Jones' email to Holtec also explains the reference to other "possible businesses, and arrangements" in the Agreement between Holtec and GEC.  The email states that "revenues resulting from these programs may be used to develop new plant builds and T&D infrastructure at Ignalina (Unit 3); Khemelnitsky 3, 4 and up to three new plants in Kazakhstan."  (Diehl Decl. Ex. 9.)  These are plainly the "possible businesses, and arrangements" referred to in the preamble of the Agreement between Holtec and GEC.  (Id.)

This conclusion is further confirmed by the Executive Summary Mr. Jones attached to his email.  (Diehl Decl. Ex. 10 and Ex. 2, Jones Dep. Tr. at 65:5-66:16.)  The first sentence of the Executive Summary states that the "program proposes a . . . solution to . . . handling the World's spent nuclear fuel (SNF)."  (Id. Ex. 10 at p. 1, emphasis added.)  The Executive Summary also refers to a "Host Country" indicating that one country will "host" another countries' SNF.  (Id. Ex. 10 at p. 2.)  These statements in the Executive Summary further confirm that the Agreement covered GEC's business plan for an "international" SNF storage facility.  No other form of SNF storage facility is discussed.

### C.      The Ambiguity Should Be Construed Against GEC

GEC admits to drafting the Agreement.  (Diehl Decl. Ex. 2, Jones Dep. Tr. at 62:5-63:5.) As such, ambiguities in the Agreement between Holtec and GEC should be construed against GEC.  See Gambino v. Richard W. Reid Elec. Co., Inc., No. 07-11530-RWZ, 2008 U.S. Dist. LEXIS 4256, at *5-6 (D. Mass. Jan. 18, 2008). Pursuant to this rule of law, the scope of the Agreement is plainly limited to GEC's business plan of establishing an "international" SNF storage facility.  See Gambino, 2008 U.S. Dist. LEXIS 4256, at *5-6.

### D.      Holtec Considered GEC's Concept Absurd And Never Pursued It

When Holtec's CEO, Dr. Singh, heard of GEC's business plan for an "international" SNF storage facility, he considered it "absurd."  (Diehl Decl. Ex. 1, Singh Dep. Tr. at 59:7-14.) Holtec has never pursued an "international" SNF storage facility where one country stores another countries' SNF.  (Diehl Decl. Ex. 1, Singh Dep. Tr. at 59:7-9; Singh Decl. ¶¶ 4 and 6.) Further, GEC has presented no evidence that Holtec pursued an "international" SNF storage facility.

Since Holtec has never pursued an "international" SNF storage facility and since the Agreement is limited to such a concept, Holtec has not "circumvented" GEC in breach of the Agreement as a matter of law.[11]

---

[11]      Since Holtec did not pursue GEC's business plan of establishing an "international" SNF storage facility it could not "circumvent" regardless of the definition of circumvention.

28

**IV.    GEC BREACHED THE AGREEMENT TERMINATING**
        **HOLTEC'S OBLIGATIONS UNDER THE AGREEMENT**

    **A.    GEC Breached The Agreement In November 2001**

When GEC signed the Agreement with Holtec in October 2001, GEC became obligated not to circumvent Holtec.  (Diehl Decl. Ex. 8, para. 8.)  GEC quickly ignored its obligations. Only one month after signing the Agreement with Holtec and only one week after meeting with Holtec (id. Exs 14 and 15), GEC communicated with Holtec's competitor Transnuclear and solicited Transnuclear to work on GEC's business plan to establish an "international" SNF storage facility concept.  (Id. Exs. 17 and 18.)  GEC even signed a confidentiality and non-circumventure agreement with Transnuclear that had terms identical to the Agreement with Holtec.  (Id. Exs. 8 and 16.)  During the discussions with Transnuclear, GEC and The Stanton Group offered the same roles ("cask and canister fabrication" and "SNF Transport and Logistics") to Transnuclear that had been offered to the Holtec Companies.  (Id. Ex. 4 at pp. 3-4 and Ex. 19 at p. 3.)

GEC's actions circumvented Holtec under any of the interpretations of circumvention that GEC has offered in this case.  From 2003 to October 2010, GEC understood that Holtec circumvented GEC by communicating and negotiating with third parties such as The Stanton Group, BNFL, Energoatom and Ambassador Herbst regarding European SNF.  (Diehl Decl. Exs. 28-35 and Ex. 2, Jones Dep. Tr. at 112:8-113:12; 132:18-135:12; 138:21-139:2; 190:25-192:25; 248:21-249:24; 295:25-296:13; 298:5-11.)  Certainly, if GEC understood these communications by Holtec to be a circumvention, then GEC knew it was circumventing Holtec in November

2001 by discussing the project that it just presented to Holtec with Transnuclear and by offering Transnuclear the same roles offered to Holtec.[12]

Thus, under its own understanding of "circumvention," GEC circumvented Holtec and breached the Agreement in November 2001.  See Lease-It, Inc. v. Mass. Port Auth., 600 N.E.2d 599, 602 (Mass. App. Ct. 1992)  ("[a] material breach of an agreement occurs when there is a breach of an essential and inducing feature of the contract").  As a result of GEC's breach, any obligation that Holtec owed to GEC under the Agreement terminated in November 2001.  See Dialogo, LLC v. Bauza, 456 F. Supp. 2d 219, 226 (D. Mass. 2006) (a prior material breach of a restrictive covenant by one party discharges the other party from any further non-compete obligations under that restrictive covenant); Center Garment Co. v. United Refrigerator Co., 369 Mass. 633, 638 (1976); Quintin Vespa Co. v. Constr. Serv. Co., 179 N.E.2d 895, 899 (Mass. 1962); Coutinho-Boisse Funeral Home, LLC v. Hamel, Wickens & Troupe Funeral Home, Inc., No. BACV2003-0653, 2008 Mass. Super. LEXIS 337, at *19 (Mass. Super. Ct. Sept. 17, 2008) quoting 23 S. Williston, Contracts §63.3 at 443 (4th ed. 2002) ("[a] party who first commits a material breach cannot enforce the contract").

Since any obligation Holtec owed to GEC under the Agreement ended in November 2001 as a result of GEC's breach, and since all of the breaches alleged by GEC occurred after March 2003 (Diehl Decl. Exs. 28-35 and Ex. 2, Jones Dep. Tr. at 112:8-113:12; 132:18-135:12; 138:21-

---

[12]     GEC's revised its stated understanding of "circumvention" in October 2010 in an attempt to avoid a statute of limitations violation.  GEC now claims that "circumvention" is the signing of a contract related to European SNF without compensating the other party (Dkt. No. 48 at p. 1). Even if that definition of "circumvention" were adopted (which it should not be), GEC's act of signing the Transnuclear agreement in November 2001 would be a breach of the Agreement with Holtec.

139:2;  190:25-192:25;  248:21-249:24;  295:25-296:13;  298:5-11),  Holtec  could  not  have

circumvented GEC under the Agreement.

     **B.**    **<u>GEC's Breach Continued In 2002</u>**

     By 2002, GEC and The Stanton Group abandoned their original business plan to establish

an "international" SNF storage facility.  (Diehl Decl. Ex 3, Browne Dep. Tr. at 18:13-25:7,

42:12-18 and 48:6-50:3; Ex. 20 and Ex. 21.)  In 2002, GEC continued to pursue Transnuclear

and Holtec at the same time in pursuit of SNF projects in Europe.  For example, on January 7,

2002, GEC's Mr. Jones noted:

> I want to keep open . . . the promise to meet with Transnuclear, <u>and
> pursue in parallel</u>.  I will approach Alan Hanson again after we
> have set a date with Moscardini and Holtec (?).

(<u>Id</u>. Ex. 23.)   On January 25, 2002, GEC plainly admitted it was reluctant to work with Holtec:

> I am a little reluctant to offer services to Holtec, with whom we me
> [sp] yesterday, as it may upset current negotiations with SG.  On
> the other hand, <u>I have already offered GEC personnel to TN
> [Transnuclear]</u>.

(<u>Id</u>. Ex. 24.)  As late as March 8, 2002 – after the GEC sent the email acknowledging it was

keeping its "international" SNF concept "quiet" (<u>Id</u>. Ex. 20) – GEC posed the question "To TN,

or not to TN," thereby admitting it was still evaluating both Holtec and Transnuclear.  (<u>Id</u>. Ex.

24.)  GEC's Mr. Jones even admitted to pursuing Holtec, Transnuclear and others while being

under a non-circumvention obligation to Holtec and Transnuclear and despite knowing only one

party could participate in the new effort that replaced the "international" SNF storage facility

business plan.  (<u>Id</u>. Ex. 2, Jones Dep. Tr. at 324:11-333:17.)  Plainly, GEC was considering

alternatives to Holtec and, under its interpretation of the Agreement, circumventing the Holtec

Companies.

To be clear, Holtec contends that the Agreement is limited to the business plan to establish an "international" SNF storage facility.  Under Holtec's theory, once GEC abandoned this project in 2002 (Diehl Decl. Exs. 20 and 21), GEC was free to work with other third parties on other types of SNF projects (as were the Holtec Companies).  However, if GEC claims that the Agreement was broader in scope than an "international" SNF storage facility, then GEC's activities in 2002 with Transnuclear were a circumvention of Holtec in breach of the Agreement which terminated Holtec's obligations to GEC.[13]  See Dialogo, 456 F. Supp. 2d at 226.  GEC cannot have it both ways – either the Agreement was limited to "international" SNF facilities and its activities permitted or the Agreement was broad and GEC's actions were not permitted under the Agreement.

## V.      HOLTEC MANUFACTURING DID NOT CIRCUMVENT GEC

The Agreement between Holtec Manufacturing and GEC has the same terms as GEC's Agreement with Holtec.  (Diehl Decl. Exs. 8 and 11.)  Holtec Manufacturing's Agreement is therefore ambiguous for the same reasons stated above with respect to Holtec's Agreement.  GEC sent very similar documents to Holtec Manufacturing to explain its project (Id. Ex. 12) as it sent to Holtec (Id. Exs 9 and 10).  Thus, Holtec Manufacturing's Agreement was limited to GEC's business plan to establish an "international" SNF storage facility for the same reasons stated above.  Holtec Manufacturing has never pursued "international" SNF storage facilities.  (Singh

_____

[13]     In April 2002, Mr. Jones of GEC wrote about GEC possibly designing and licensing plutonium shipping containers.  In that correspondence, Mr. Jones admitted that "I am not obligated in any way to another company." (Diehl Decl. ¶ 37, Ex. 37, emphasis added.)  This is a clear admission that GEC understood that the Agreements with the Holtec Companies were terminated.

Decl. ¶¶ 5-6.)  Accordingly, summary judgment should be granted that Holtec Manufacturing did not circumvent GEC under the Agreement.

Additionally, GEC's revised theory is that circumvention is the signing of a contract related to European SNF without compensating GEC.  (Dkt. No. 48 at p. 1.)  However, GEC will not be able to produce any evidence that Holtec Manufacturing signed a contract relating to European SNF, because they have not done so.  As such, Holtec Manufacturing could not have circumvented GEC pursuant to GEC's revised theory.

Lastly, just as GEC was pursuing competitors of Holtec, it was also pursuing competitors of Holtec Manufacturing, such as OMV.  (Diehl Decl. Exs. 25-27.)  GEC signed an agreement related to European SNF with OMV.  (<u>Id</u>.)  Accordingly, under any of GEC's theories of what constitutes circumvention, GEC circumvented Holtec Manufacturing, terminating any obligation that Holtec Manufacturing may have had to GEC.  <u>See Dialogo</u>, 456 F. Supp. 2d at 226.

For at least these reasons, summary judgment should be entered that Holtec Manufacturing did not breach its Agreement with GEC.

## VI.   THE HOLTEC COMPANIES DID NOT MISUSE OR DISCLOSE ANY OF GEC'S INFORMATION IN BREACH OF THE AGREEMENT

As described above, any obligation that the Holtec Companies owed to GEC under the Agreements ended when GEC breached the Agreements in November 2001 and in 2002.  <u>See Dialogo</u>, 456 F. Supp. 2d at 226; <u>Center Garment Co.</u>, 369 Mass. at 638; <u>Quintin Vespa Co.</u>, 179 N.E.2d at 899; <u>Coutinho-Boisse Funeral Home, LLC</u>, 2008 Mass. Super. LEXIS 337, at *19; quoting 23 S. Williston, Contracts §63.3 at 443 ("[a] party who first commits a material breach cannot enforce the contract").  There is no survival term in the Agreements as to the confidentiality provisions.  (Diehl Decl. Exs. 8 and 11.)  Accordingly, any obligation that the

Holtec Companies may have owed to GEC terminated in November 2001 when GEC breached the Agreements.

The evidence of record also demonstrates that GEC was misusing the Holtec Companies' information while meeting with Transnuclear.  During the 2002 timeframe, GEC admitted it did not want "to give up following parallel paths" with the Holtec Companies and Transnculear because it "learned something very important each time" they met.  (Diehl Decl. Ex. 24.) Plainly, GEC was using the Holtec Companies' information and Transnculear's information to evaluate which company it preferred.  GEC was therefore using the Holtec Companies' information in circumvention of the Holtec Companies in breach of the Agreements.  (Id. Ex. 8.) GEC was also using Transnuclear's information in circumvention of Transnuclear in breach of the agreement with Transnuclear.  (Id. Ex. 16.)  It is clear that GEC did not feel bound by any of its agreements and breached its confidentiality obligations under the Agreement with Holtec. Accordingly, GEC cannot enforce any of the confidentiality provisions of the Agreements against the Holtec Companies.  See Dialogo, 456 F. Supp. 2d at 226; Center Garment Co., 369 Mass. at 638; Quintin Vespa Co., 179 N.E.2d at 899; Coutinho-Boisse Funeral Home, LLC, 2008 Mass. Super. LEXIS 337, at *19; quoting 23 S. Williston, Contracts §63.3 at 443 ("[a] party who first commits a material breach cannot enforce the contract").

## <u>CONCLUSION</u>

GEC presented a business plan to the Holtec Companies relating to an "international" SNF storage facility that GEC eventually abandoned.  GEC is now trying to extend the scope of its Agreements with the Holtec Companies to cash in on Holtec's later successes.  Contrary to GEC's current allegations, it is clear that GEC did not view the Agreement as being enforceable in late 2001 and 2002 because GEC behaved as if the Agreements did not exist.  GEC pursued

Holtec's competitors on SNF projects as if the non-circumvention clauses were not in effect.  In mid-2002, GEC even admitted it was not obligated to any company.  Thus, GEC's claims of breach of contract are baseless, and for the reasons stated above, Holtec and Holtec Manufacturing respectfully request that judgment be entered as a matter of law under Fed. R. Civ. P. 56(c) that the Agreements between GEC and the Holtec Companies are unenforceable and that the Holtec Companies did not breach the Agreements.

May 17, 2011

Respectfully submitted,

/s Noah H. Charlson
Noah H. Charlson
ncharlson@bazless.com
BAZELON LESS & FELDMAN, P.C.
1515 Market Street, Suite 700
Philadelphia, PA 19102
(215) 568-1155

Glen M. Diehl, *pro hac vice*
DIEHL SERVILLA LLC
33 Wood Avenue South
Second Floor, Suite 210
Iselin, New Jersey 08830
(732) 815-0404

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2011, I served a copy of the foregoing Notice of Motion of Summary Judgment, supporting Memorandum of Law, the Proposed Order, and the declarations of Glen M. Diehl, Esquire and Dr. Kris Singh by the Court's ECF system, and by electronic mail delivery, upon the following counsel of record for plaintiffs:

Richard Lipow, Esq.
629 Swedesford Road
Swedesford Corporate Center
Malvern, PA 19355
Richard@lipowlaw.com

/s Noah H. Charlson
NOAH H.CHARLSON